# EXHIBIT NO. 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

BOHIO7, LLC

    Plaintiff,

vs.

1737 H STREET, LLC

    Defendant.

Case No. 1:19-CV-03118

## AFFIDAVIT OF NEIL PATEL

  I, **NEIL PATEL**, being first duly sworn and deposed, hereby affirm under penalties of perjury as follows:

  1.  I am over the age of eighteen (18) years and am otherwise competent to testify to the matters set forth below which information is based upon my personal knowledge unless otherwise indicated.

  2.  I submit this affidavit in support of the Motion for Summary Judgment filed by Plaintiff Bohio7, LLC on its Complaint for Specific Performance against Defendant 1737 H Street, LLC filed in the above-captioned proceeding.

  3.  Plaintiff Bohio7, LLC ("Buyer") is a Delaware limited liability company authorized to transact business in the District of Columbia with a business address located at 1920 L Street, N.W., Washington, D.C. 20036. The Buyer's sole member is Daily Caller, Inc. ("Daily Caller"), a Delaware corporation whose principal place of business is in the District of Columbia. The Daily Caller is the managing member of the Buyer. I am President of the Daily Caller.

1

4.      Defendant 1737 H Street, LLC ("Seller") is Delaware limited liability company with a business address of 1420 Beverly Road, Suite 310, McLean, Virginia, 22101. The sole member of Seller is Aeolos Investments Limited, a Bermudan company, with a principal business office located at 22 Victoria Street, Hamilton HM 12, Bermuda.

5.      The Seller is the owner of the real property designated as Lot 40 in Square 127 in the land records for the District of Columbia located at 1737 H Street, N.W., Washington, D.C. ("Land") and the improvements on the Land ("Improvements"). The Land and Improvements are collectively referred to as the "Real Property".

6.      The Improvements on the Land is an office building consisting of five (5) floors and a basement, containing approximately 19,770 square feet ("Office Building"). As of the date this Complaint was filed the Office Building is vacant and not occupied by the Buyer and remains vacant and not occupied as of today.

7.      The Seller and Buyer entered into a Purchase and Sale Agreement, dated September 3, 2019 ("PSA"), wherein the Buyer agreed to purchase, and the Seller agreed to sell, the Real Property for a purchase price of Eight Million Dollars ($8,000,000.00) ("Purchase Price").

8.      A true and accurate copy of the PSA is attached hereto as Exhibit "A".

9.      The Buyer had entered into the PSA with the intention of having its sole member Daily Caller relocate its business operations from its current location at 1920 L Street, N.W., Suite No. 200, Washington, D.C. 20036 ("Current Premises") to the Office Building.

10.     Daily Caller's lease for the Current Premises expired on September 30, 2019, and after that date Daily Caller would be liable for holdover rent if it remained in occupancy of the Current Premises.

11.     In addition to the Real Property being sold under the PSA, the Buyer agreed to purchase, and the Seller agreed to sell, the "Personal Property" associated with the Real Property as defined in §1.2 of the PSA.

12.     Pursuant to §2.3 of the PSA the closing was to occur on September 30, 2019 ("Closing").

13.     The Closing was to be conducted by Terra Nova Title & Settlement Services ("Settlement Agent") located at 1211 Connecticut Avenue, N.W., Suite 401, Washington, D.C. 20036.

14.     Pursuant to §10.2.1 of the PSA, the Seller agreed to pay the transfer tax incident to the transfer of the Real Property ("Transfer Tax").

15.     Pursuant to §10.2.2 of the PSA, the Buyer agreed to pay the recordation tax and deed of trust recordation tax incident to the transfer of the Real Property (collectively the "Recordation Tax").

16.     It was agreed that the Closing would occur before October 1, 2019 in order to avoid the expense of the increase in the Transfer and Recordation taxes from 2.9% to 5% that went into effect on October 1, 2019.

17.     Had the Closing occurred on September 30, 2019 the Buyer would have been required to pay $132,765.63 for the Recordation Tax.

18.     Due to the delay in the Closing beyond September 30, 2019, the amount of Recordation Tax that the Buyer will need to pay at Closing will increase by $96,140.62.

19.     Upon consummation of the Closing on September 30, 2019, the Daily Caller was planning to promptly move its business operations into the Office Building so as to avoid paying both the monthly mortgage payment for the Real Property and hold over rent for the Current Premises.

20.     Pursuant to §9.1.1 of the PSA, at the Closing scheduled for September 30, 2019 the Seller was required to execute a Deed "conveying to Buyer title to the Real Property, free from all liens, encumbrances, easements, conditions and other matters affecting title except the Permitted Exceptions".

21.     Pursuant to §3.6.2 of the PSA, at the Closing scheduled for September 30, 2019 the Seller was obligated to convey to Buyer title to the Real Property free and clear of the "Mandatory Cure Items" defined in the PSA as follows:

> All deeds of trust, mortgages, judgment liens, and other monetary liens (including, but not limited to, UCC-1 Financing Statement No's 20181442009 and 20181022301 filed by Spectrum Origination LLC, against 1737 H Street, LLC) and all mechanic's and materialmen's liens filed (but excluding all liens caused by acts of Buyer or its agents, employees, contractors or representatives) are deemed to be objections that Seller shall be obligated to Cure at or prior to Closing. Buyer shall have the right to apply a portion of the Purchase Price to Cure such monetary liens at Closing. ["Mandatory Cure Items"].

22.     In furtherance of this requirement, the parties secured a title report on the Property and Commitment for Title Insurance ("Title Commitment"). The Title Commitment identified the Mandatory Cure Items referenced in §3.6.2 of the PSA that needed to be removed from the land records as follows:

(a)    Deed of Trust from 1737 H Street, LLC, a Delaware limited liability company, to Daniel M. Lopez, Trustee, dated March 1, 2018 and recorded March 2, 2018 as Document No. 2018022299 securing Spectrum Organization LLC, a Delaware limited liability company, in the amount of $10,597,850.00.

(b)    Assignment of Leases and Rents from 1737 H Street, LLC, a Delaware limited liability company, to Spectrum Organization LLC, a Delaware limited liability company, dated March 1, 2018 and recorded March 2, 2018 as Document No. 2018022300.

(c)    UCC Financing Statement from 1737 H Street, LLC, a Delaware limited liability company, to Spectrum Organization LLC, a Delaware limited liability company, recorded March 2, 2018 as Document No. 2018022301.

23.    As of the Closing Date on September 30, 2019, the Buyer was ready, able and willing to proceed with and consummate the Closing and had delivered to the Settlement Agent by that date the "Buyer's Closing Deliveries" as required by §9.2 of the PSA in order to perform its obligations under the PSA.

24.    The Buyer's lender, Congressional Bank, was prepared to fund the loan of 7,013,489.00 ("Loan") the Buyer has secured to consummate the purchase of the Property under the PSA in conjunction with other funds the Buyer had on hand to pay the balance of the Purchase Price.

25.    On the closing date of September 30, 2019, the Seller failed to deliver the Deed required by the PSA along with the other "Closing Deliveries" as required by §9.1 of the PSA, nor did the Seller remove the Mandatory Cure Items.

26.    As result of the Seller's failure to consummate the Closing, the Buyer will now incur increased Recordation Taxes of $96,140.62 in order to effectuate the sale and transfer of the Real Property under the PSA.

27.     As result of the Seller's failure to consummate the Closing, the Daily Caller was required to negotiate and execute a new one year lease for its Current Premises, but secured an option to terminate the lease on or after May 1, 2020 in anticipation of being able to consummate the purchase of the Real Property through entry of an order of specific performance.

28.     To avoid having to pay at the same time both rent for the Current Premises and a mortgage payment for the Real Property, the Buyer would request that the date for closing on the PSA be set no sooner than April 24, 2020 so that Daily Caller can exercise its right of termination to be effective on or about the new closing date.

Date: 10-30-19

Neil Patel

6

# EXHIBIT "A"

PURCHASE AND SALE AGREEMENT

*CHW by VAT*
*by VAT*

*September* This PURCHASE AND SALE AGREEMENT ("Agreement") is made as of the 3ʳᵈ day of ~~August~~ 2019 ("Effective Date"), by and between 1737 H STREET, LLC, a Delaware limited liability company ("Seller"), and BOHIO7 LLC, a Delaware limited liability company ("Buyer").

*CHW by VAT*

Whereas, Seller is the owner of an improved parcel of real property located at 1737 H Street, N.W., Washington D.C. and associated personal property; and

Whereas, Seller desires to sell the Property (defined below) to Buyer and Buyer desires to purchase the Property from Seller on the terms and conditions set forth in this Agreement;

Therefore, in consideration of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   AGREEMENT TO PURCHASE AND SELL.

Seller hereby agrees to sell, and Buyer hereby agrees to purchase, subject to the terms and conditions of this Agreement, the following real and personal property (collectively, "Property"):

1.1.   Real Property. Fee simple title in and to the land described on Exhibit A attached hereto, together with all easements, rights, privileges and benefits appurtenant thereto and any land lying in the bed of any street, road, avenue, open or proposed, public or private, in front of or adjoining the said land or any portion thereof, to the center line thereof (collectively, "Land"), and the buildings and other improvements thereon (collectively, "Improvements"). The Land and the Improvements are collectively referred to as the "Real Property."

1.2.   Personal Property. All of Seller's right, title and interest in and to all fixtures and all other tangible personal property used solely in connection with the operation of the Improvements and located in or on the Improvements including, without limitation, boilers, pumps, tanks, electric panel switchboards, lighting equipment and wiring, heating, plumbing, ventilating and air conditioning apparatus and equipment, furniture and furnishings, including but not limited to the items listed on Schedule 1.2 hereto, together with all assignable intangible property used solely in connection with the operation or maintenance of the Real Property, including, without limitation, (a) licenses, plans, permits and approvals relating to the construction, use, occupancy and operation of the Property, if any currently exist and are in Seller's possession, and (b) if still in effect, all guaranties, warranties and indemnities received by Seller from any contractor, manufacturer or other person and all claims against any such other person in connection with the construction, use, occupancy or operation of the Property and (c) Seller's assignable and transferable right, title, and interest in and to all development, density, air, and water rights attributable to or arising from the Property; and (d) all transferable consents, authorizations, variances or waivers, licenses, permits, certificates of occupancy, and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely with respect to the Land or Improvements. All of the foregoing are collectively referred to as the "Personal Property."

2.   PURCHASE PRICE AND PAYMENT.

1

2.1.   Purchase Price. The purchase price for the Property ("Purchase Price") shall be Eight Million Dollars ($8,000,000.00). Subject to the terms and conditions of this Agreement, the Purchase Price shall be paid as follows.

2.2.   Deposit and Payment. Within two (2) business days of the execution of this Agreement, Buyer shall deliver Eighty Thousand Dollars ($80,000.00) as the "Initial Deposit", as an earnest money deposit with Terra Nova Title & Settlement Services ("Escrow Agent"). In addition, if this Agreement is not timely terminated by Buyer in accordance with the terms of Section 3 hereof, Buyer shall deliver an additional Two Hundred Forty Thousand Dollars ($240,000.00) as an "Additional Deposit", as an additional earnest money deposit, with the Escrow Agent within one (1) business day following the expiration of the Study Period. The Initial Deposit and, if deposited, the Additional Deposit are hereinafter collectively referred to in this Agreement as the "Deposit" If the Deposit is not posted as and when required as provided above, then, at Seller's option, this Agreement shall terminate. The Deposit shall be held by Escrow Agent pursuant to an escrow agreement. At or prior to 4:00 p.m., Washington, D.C. time, on the Closing Date, Buyer shall deposit or cause to be deposited with the Escrow Agent sums in immediately available funds sufficient to pay the Purchase Price (with a credit for the Deposit) and all other amounts necessary to satisfy Buyer's obligations with respect to closing the transactions contemplated in this Agreement.

2.3.   Closing. Closing hereunder ("Closing") will take place pursuant to an escrow closing, conducted by the Escrow Agent, commencing at 10:00 a.m. Washington, D.C. time on or before the earlier of (i) thirty (30) days from the expiration of the Study Period or (ii) September 30, 2019 ("Closing Date"). Notwithstanding anything to the contrary in this Agreement, if the Closing has not occurred by September 30, 2019 ("Outside Closing Date"), due to a delay caused solely by Seller, Buyer shall have the right to terminate this Agreement by giving written notice thereof no later than October 1, 2019. In the event of such termination, (a) the Deposit shall be returned to Buyer and (b) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation to the other under this Agreement. On or prior to the Closing Date, the parties shall deposit in escrow with the Escrow Agent all documents, instruments and funds required to be delivered by such party in order to consummate Closing pursuant to this Agreement.

3.   STUDY PERIOD.

3.1.   Study Period. During the period ("Study Period") that commences on the Effective Date and ends at 5:00 p.m. Washington, D.C. time five (5) days prior to the Closing Date, Buyer, its agents, employees and contractors shall be entitled, to enter upon the Real Property, upon reasonable prior written notice to Seller (which notice may be made by email), to perform inspections and tests of the Real Property, including, without limitation, surveys, environmental studies, examination and tests of all structural and mechanical systems within the Improvements and studies of all other matters that Buyer wishes to consider at Buyer's sole cost and expense. Seller shall reasonably cooperate with Buyer in its due diligence but shall not be obligated to incur any liability or expense in connection therewith. All inspections shall occur at reasonable times agreed upon by Seller and Buyer. Seller shall be entitled to have a representative present during any entry onto the Real Property by Buyer or its agents. In no event shall Buyer perform any test borings or other intrusive testing, with respect to the Real Property without the prior written

consent of Seller, which consent may not be unreasonably withheld, conditioned or delayed. In accordance with the District of Columbia Underground Storage Tank Management Act of 1990, as amended, D.C. Code Section 8-113.02(g), the parties acknowledge that Seller has informed Buyer in writing prior to entering into this Agreement that Seller has no knowledge of the existence on, or removal from, the Real Property of any underground storage tank.

3.2.    Limitation on Inspections.  In connection with the right to enter upon the Real Property set forth in this Section 3, Buyer agrees (i) to comply with all applicable laws and (ii) to restore the Property to its prior condition after the performance of any such inspection or test. In addition, and notwithstanding the foregoing provisions of this Section 3, Buyer and its agents, employees and contractors shall: (a) not damage any part of the Property; (b) not injure or otherwise cause bodily harm to Seller, its agents, contractors and employees; (c) promptly pay when due the costs of all tests, investigations and examinations with regard to the Property conducted by or at the instruction of Buyer; and (d) not permit any liens to attach to the Property by reason of the exercise of its rights under this Section 3.  Buyer shall, and does hereby agree to, indemnify, defend and hold Seller, its property manager and partners, and their respective employees, attorneys and agents, and their respective heirs, successors, personal representatives and assigns (collectively, including the Seller, "Seller Related Parties"), harmless from and against any and all claims, demands, losses, liabilities and expenses (including, but not limited to, attorneys' fees) caused, directly or indirectly, by the actions of Buyer and any and all of Buyer's agents, employees and contractors (and any others entering onto the Real Property for or at the request of Buyer) taken or occurring in, on or about the Real Property in the exercise of the inspection rights granted pursuant to this Section 3; provided, however, such indemnity shall not extend to protect Seller from any pre-existing liabilities for matters merely discovered by Buyer (such as latent environmental contamination) as long as Buyer's actions do not aggravate any pre-existing condition or disturb any such latent environmental contamination.  The provisions of this Section 3.2 shall survive the Closing or termination of this Agreement and shall not be limited by any liquidated damages provisions.

3.3.    Insurance.  Prior to entry upon the Property, Buyer shall deliver to Seller evidence reasonably satisfactory to Seller that Buyer has obtained commercial general liability insurance in an amount of not less than $2,000,000.00 and written on such forms as are reasonably acceptable to Seller, naming Seller as an additional insured, with respect to the Property and any entry onto or activities on or about the Real Property by Buyer and all of Buyer's agents, employees and contractors (and any others entering onto the Real Property for or at the request of Buyer).

3.4.    Termination Option.  Buyer shall have the right to terminate this Agreement if it determines in its sole discretion for any reason whatsoever not to proceed with this transaction by giving written notice of such election to terminate to Seller and Escrow Agent via electronic mail by no later than 5:00 p.m. Washington, D.C. time on the last day of the Study Period, in which event (a) the Deposit shall be returned to Buyer and (b) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation to the other under this Agreement.  In the absence of such timely notice, the termination option provided for in this Section 3.4 shall automatically expire and be of no further force or effect, and, provided that Buyer timely delivers the Additional Deposit, this Agreement shall continue in full force and effect and the Deposit shall become non-refundable to Buyer except for Seller's material default under this Agreement.

3.5.   Title and Survey.  During the Study Period, Buyer shall promptly obtain a title commitment ("Title Commitment") for a title insurance policy from First American Title Insurance Company ("Title Company") and, if Buyer desires, an ALTA/NSPS survey of the Real Property ("Survey").

3.6.   Title and Survey Objections.  Buyer shall have the right to object to any title or survey matters affecting the Real Property by giving written notice to Seller no later than the earlier of (a) the date which is five (5) business days after Buyer's receipt of the later to be received of (i) the Title Commitment and (ii) the Survey, or (b) the date which is five (5) days prior to the expiration of the Study Period, stating the matters to which Buyer objects and the reasons therefor. If Buyer timely objects to any title or survey matter affecting the Real Property, then Seller shall, within four (4) days after receipt of such written notice (but in any event, at least three (3) days prior to expiration of the Study Period), notify Buyer in writing of its election to Cure or not to Cure Buyer's objections and, if Seller elects to Cure, Seller shall use reasonable efforts to the extent provided for in Seller's election to Cure such objections and shall provide Buyer with a reasonably detailed description of the Cure to be undertaken, together with a description of the time frame in which such Cure is to be effected. Seller's failure to timely notify Buyer as set forth above shall be deemed an election by Seller not to Cure any title or survey matters. If Seller elects not to Cure any such objections, Buyer's sole recourse shall be to exercise its right to terminate this Agreement during the Study Period as provided in Section 3.4 of this Agreement. In the event Buyer does not terminate this Agreement during the Study Period, all title and survey matters existing on the respective dates of the Title Commitment and Survey, other than Mandatory Cure Items (defined below) shall become Permitted Exceptions hereunder. For purposes of this Section 3, the term "Cure" shall mean, at Seller's election (i) the removal of such matter of record, or (ii) the provision of information or bond to the Title Company sufficient to remove such matter as an exception in the Title Commitment.

The term "Permitted Exceptions" shall mean (i) liens for unpaid real estate, water and sewer charges, vault rents, and personal property taxes or assessments that are not due and payable prior to the Closing Date, if any, provided that such items are paid in full by Seller and released of record to the satisfaction of the Title Company, or apportioned as provided in this Agreement; (ii) zoning laws and regulations and ordinances, proffers and similar conditions of governmental authorities; (iii) any matters caused by Buyer, its agents or other representatives at Buyer's request or with Buyer's consent, (iv) all matters reasonably discoverable by an accurate survey or that appear on the public record which are not timely objected to by Buyer as provided above or which are timely objected to but such objection is thereafter waived by Buyer, (v) all documents, easements, encumbrances and other matters permitted or contemplated to be recorded pursuant to the terms of this Agreement, and (vi) any matters which become Permitted Exceptions pursuant to Section 3.5.1 below.

3.6.1.   Seller's Opportunity to Cure.  If Seller elects to Cure any title or survey objection, Seller shall have until the Outside Closing Date. to do so.  If such objections are not Cured within the foregoing time period, then Buyer shall on or before 5 days after Seller notifies Buyer that it has been unable to accomplish the Cure either: (a) terminate this Agreement, in which event (i) the Deposit shall be returned to Buyer, and (ii) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation to the other under

this Agreement, or (b) proceed to Closing under this Agreement and take title to the Property subject to such uncured objections without any reduction in the Purchase Price, in which case such uncured objections shall become Permitted Exceptions. Buyer's failure to make a timely election under this Section 3.6.1 shall be deemed an election under clause (a) to terminate this Agreement.

3.6.2. <u>Mandatory Cure Items</u>. All deeds of trust, mortgages, judgment liens, and other monetary liens (including, but not limited to, UCC-1 Financing Statement No's 20181442009 and 20181022301 filed by Spectrum Origination LLC, against 1737 H Street, LLC) and all mechanic's and materialmen's liens filed (but excluding all liens caused by acts of Buyer or its agents, employees, contractors or representatives) are deemed to be objections that Seller shall be obligated to Cure at or prior to Closing. Buyer shall have the right to apply a portion of the Purchase Price to Cure such monetary liens at Closing.

3.7.    <u>Contracts</u>. On or before the expiration of the Study Period, Buyer shall notify Seller in writing if Buyer elects not to assume at Closing any of the Contracts (as defined below). Seller shall give notice of termination of such disapproved contract(s); provided, if by the terms of the disapproved contract any fee or other compensation is due thereunder as a result of such termination, Buyer shall be required at Closing to assume all obligations thereunder until the effective date of the termination and Seller shall credit Buyer at Closing for such termination charge. Notwithstanding anything to the contrary, Seller shall terminate all management and brokerage agreements on or before Closing at its sole cost and expense.

4.    <u>SELLER'S REPRESENTATIONS AND WARRANTIES.</u>

4.1.    <u>Representations and Warranties</u>. Seller represents and warrants to Buyer that the following are true and correct in all material respects as of the date hereof. Each of Seller's representations and warranties contained herein shall remain true and correct in all material respects as of the Closing:

4.1.1. <u>Authority</u>. Seller is a limited liability company duly formed and validly existing under the laws of the State of Delaware, and is in good standing in the District of Columbia and State of Delaware. Seller has obtained all consents necessary for it to enter into and perform under this Agreement. This Agreement has been, and all of the documents to be delivered by Seller at Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

4.1.2. <u>No Violation</u>. The execution, delivery and performance by Seller of this Agreement will not result in a violation by Seller of its obligations under any of the following that are binding on Seller: (a) any judgment or order entered by any court or governmental body, (b) any governmental statute, ordinance, code, rule or regulation, or (c) any contract or agreement or indenture.

4.1.3. <u>No Condemnation</u>. There are no pending or to Seller's Knowledge, threatened, condemnation, eminent domain or similar proceedings with respect to all or any portion of the Real Property.

4.1.4. <u>Compliance</u>. There are no uncured notices of a material violation of any applicable governmental statute, ordinance, code, rule or regulation affecting the Real Property.

All required Office/Retail Income and Expense reports have been timely filed with the District of Columbia Office of Tax and Revenue. No portion of the Real Property is currently or has been in the past twelve (12) months used for residential purposes within the meaning of the District of Columbia Rental Housing and Conversion Sale Act (Title 45, Chapter 16), as amended.

4.1.5.   Litigation.  There are no pending or threatened, actions, suits or proceedings against or affecting Seller or the Property, or arising out of the ownership, management or operation of the Property, this Agreement or the transactions contemplated by this Agreement that will bind or burden the Property after the Closing or prevent Seller from fulfilling its obligations under this Agreement. No proceeding is pending for the reduction or increase of the assessed real estate tax valuation of the Real Property or any portion thereof.

4.1.6.   Lease.  There are no leases, licenses or occupancy agreements in effect with respect to the Property.

4.1.7.   Contracts.  Other than a management contract which will be terminated at Closing and the service contracts listed on Exhibit E (the "Contracts"), Seller is not a party to any utility, supply, management, maintenance or other contract or agreement affecting the Property and the Property will be delivered at Closing free of all such contracts.

4.1.8.   FIRPTA.  Seller is not a "foreign person" as defined in Internal Revenue Code Section 1445(f)(3).

4.1.9.   Environmental.  Except as disclosed in any environmental reports or other information made available to Buyer by Seller or otherwise obtained by Buyer, or otherwise disclosed by Seller to Buyer in writing, to Seller's Knowledge, there are no uncured material violations of any Environmental Law with respect to the Real Property or any portion thereof. As used in this Agreement, the term "Environmental Law" means any law, statute, ordinance, rule, regulation, order or determination of any governmental authority or agency affecting the Real Property and pertaining to health or the environment including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1982 and the Resource Conservation and Recovery Act of 1986.

4.1.10.  Bankruptcy.  Seller has not (a) commenced a voluntary case with respect to it or its assets or entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (b) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator, or similar official in any federal, state, or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, or (c) made a general assignment for the benefit of creditors. The consummation of the transactions contemplated by this Agreement and the performance of the Seller's obligations under this Agreement shall not cause the Seller to become insolvent.

4.1.11.  OFAC Compliance.  Seller is currently in compliance with and shall at all times during the term of this Agreement remain in compliance with the regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order

(including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto. Seller is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Bank Secrecy Act, as amended by The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, Title III of the USA Patriot Act, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

4.1.12. ERISA. The Seller is not an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, a "plan", within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended, or an entity deemed to hold "plan assets" within the meaning of 29 CFR Sec. 2510.3-101 of any such employee benefit plan or plans.

4.1.13. Operating Statements. The operating and expense statements delivered to Buyer pursuant to this Agreement show all items of income and expense (operating and capital) incurred in connection with the ownership, operation, and management of the Property for the periods indicated and are true, correct, and complete in all material respects.

4.1.14. Due Diligence Materials. To Seller's Knowledge, the copies of the documents containing information material to the ownership or operation of the Property delivered to Buyer are correct and complete copies; and Seller is not aware of any material inaccuracy or omission in such information.

4.2.     Matters Pertaining to Representations and Warranties of Seller. As used throughout this Agreement, the phrase "to Seller's Knowledge" or phrases of similar import shall mean the actual, not constructive or imputed, knowledge of Charis C. Lapas, Vice President (the "Knowledge Parties") without any obligation on their part to make any independent investigation of the matters being represented and warranted, or to make any inquiry of any other persons, or to search or examine any files, records, books or correspondence. Nothing in this Agreement shall be construed to imply that any of the Knowledge Parties have any personal liability for a breach of a representation or warranty set forth in this Agreement. To the extent any inaccuracy in a representation and warranty of Seller in this Agreement is expressly disclosed in any of the documents or information provided or made available to Buyer or otherwise obtained by Buyer, such representation and warranty shall be deemed modified to reflect such inaccuracy. Further, to the extent Buyer discovers prior to the end of the Study Period any inaccuracy in a representation and warranty of Seller in this Agreement and Buyer does not terminate this Agreement as provided in Section 3.4 of this Agreement, such representation and warranty shall be deemed modified to reflect such inaccuracy and Buyer shall so notify Seller.

4.3.     Survival. Seller's representations and warranties set forth in this Agreement shall survive the Closing for a period ("Survival Period") of twelve (12) months and any action brought on Seller's representations and warranties shall be commenced within the Survival Period or shall be forever barred and waived.

5.    SELLER'S COVENANTS.

5.1.    Maintenance of Property. From and after the Effective Date through the Closing, the Real Property will be operated and managed by or on behalf of Seller in a manner substantially consistent with the way the Real Property is presently being operated and managed. Through the Closing, Seller will maintain in existence current insurance policies appropriate to the ownership and operation of the Property.

5.2.    Negative Covenants. From the Effective Date until the Closing Date, Seller shall not take any of the following actions without the prior express written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed prior to expiration of the Study Period and which consent may be granted or withheld by Buyer in its sole discretion thereafter: (a) make or permit to be made any alterations to or upon the Real Property or any part of the Real Property; (b) grant any liens or encumbrances upon the Property that will not be discharged upon the Closing; (c) remove or permit the removal from the Real Property of any fixtures, mechanical equipment, or any other item included in the Real Property, unless the same are replaced with a comparable item, or (d) enter into any other agreements which may affect the Property after Closing.

6.    BUYER'S REPRESENTATIONS AND WARRANTIES.

Buyer represents and warrants to Seller that the following are true and correct in all material respects as of the date hereof:

6.1.    Authority. Buyer is a Delaware limited liability company duly formed, validly existing, and is and in good standing under the laws of the District of Columbia and authorized to do business in the District of Columbia, and Buyer has all requisite power and authority to enter into this Agreement and all documents now or hereafter to be executed and delivered by Buyer pursuant to this Agreement and to perform its obligations under this Agreement and under such documents. Buyer has obtained all consents necessary for it to enter into and perform under this Agreement.

6.2.    No Violation. The execution, delivery and performance by Buyer of this Agreement will not result in a violation by Buyer of (a) any judgment or order entered by any court or governmental body, (b) any governmental statute, ordinance, code, rule or regulation, or (c) any contract or agreement or indenture.

6.3.    Bankruptcy. Buyer has not (a) commenced a voluntary case with respect to it or its assets, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (b) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator, or similar official in any federal, state, or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, or (c) made a general assignment for the benefit of creditors.

6.4.    OFAC Compliance. Buyer is currently in compliance with and shall at all times during the term of this Agreement remain in compliance with the regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute,

executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

7.    AS IS PURCHASE.

EXCEPT FOR SUCH REPRESENTATIONS AND WARRANTIES AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT OR AT CLOSING, BUYER IS ACQUIRING THE PROPERTY IN ITS "AS IS" CONDITION, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY, EXPRESS, IMPLIED OR STATUTORY, ALL OF WHICH ARE HEREBY WAIVED AND DISCLAIMED BY BUYER. NEITHER SELLER NOR ANY SELLER RELATED PARTIES (INCLUDING, WITHOUT LIMITATION, BROKER (AS HEREINAFTER DEFINED)) HAS MADE ANY REPRESENTATIONS OR WARRANTIES, DIRECT OR INDIRECT, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, TO BUYER OR ANY AGENTS, REPRESENTATIVES, CONTRACTORS OR EMPLOYEES OF BUYER WITH RESPECT TO THE CONDITION OR CONSTRUCTION OF THE PROPERTY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, ITS MERCHANTABILITY, ITS COMPLIANCE WITH ANY LAWS, OR OTHERWISE AND BUYER IS NOT AWARE OF AND DOES NOT RELY UPON ANY SUCH REPRESENTATION. BUYER ACKNOWLEDGES THAT THE STUDY PERIOD WILL HAVE AFFORDED BUYER THE OPPORTUNITY TO MAKE SUCH INSPECTIONS (OR HAVE SUCH INSPECTIONS MADE BY CONSULTANTS) AS IT DESIRES OF THE PROPERTY AND ALL FACTS RELEVANT TO ITS VALUE AND USE, INCLUDING, WITHOUT LIMITATION, THE INTERIOR, EXTERIOR, STRUCTURE, AND CONSTRUCTION OF ALL IMPROVEMENTS, IF ANY, AND THE CONDITION OF SOILS AND SUBSURFACES. EXCEPT WITH RESPECT TO A BREACH BY SELLER OF ANY REPRESENTATION OR WARRANTY EXPRESSLY CONTAINED IN THIS AGREEMENT OR AT CLOSING, BUYER HEREBY WAIVES, RELEASES AND FOREVER DISCHARGES THE SELLER RELATED PARTIES OF AND FROM ANY AND ALL CLAIMS, DEMANDS, LOSSES, LIABILITIES AND EXPENSES WHATSOEVER, DIRECT OR INDIRECT, KNOWN OR UNKNOWN, CONTINGENT OR NOT CONTINGENT, WHICH BUYER NOW HAS OR WHICH MAY ARISE IN THE FUTURE AGAINST ANY OF THE SELLER RELATED PARTIES RELATED IN ANY WAY TO THIS AGREEMENT OR THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ITS CONSTRUCTION, VALUE, COMPLIANCE WITH LAWS, OR CONDITION.

8.    CONDITIONS TO CLOSING.

8.1.    Buyer's Conditions. Buyer's obligation to consummate Closing pursuant to this Agreement is conditioned upon the satisfaction (or waiver by Buyer) of the following conditions on and as of the Closing Date:

8.1.1. Seller shall have performed and satisfied its obligations under this Agreement in all material respects.

8.1.2.  The representations and warranties of Seller shall be true and correct in all material respects as of the Closing Date.

8.2.  Seller's Conditions.  Seller's obligation to consummate Closing pursuant to this Agreement is conditioned upon the satisfaction (or waiver by Seller) of the following conditions on and as of the Closing Date:

8.2.1.  Buyer shall have performed and satisfied its obligations under this Agreement in all material respects.

8.2.2.  The representations and warranties of Buyer shall be true and correct in all material respects as of the Closing Date.

8.3.  Failure of Condition.  In the event that any condition set forth in Sections 8.1 or 8.2 is not satisfied or waived by Buyer or Seller, as the case may be, on or as of the Closing Date, and the other party is not otherwise in default hereunder, the sole right of Buyer and Seller, as applicable, shall be either (a) to terminate this Agreement by delivering written notice of such termination to the other party on or prior to the Closing Date, in which event the Deposit shall be returned to Buyer and the parties shall have no further obligations or liabilities to the other hereunder, except as expressly provided for in this Agreement, or (b) to waive the satisfaction of such condition or conditions and proceed to Closing in accordance with and subject to the terms of this Agreement.  As applicable, Seller or Buyer shall elect to proceed under either clause (a) or (b) above within five days after the date otherwise fixed for Closing under this Agreement and failure to make a timely election shall be deemed an election to terminate this Agreement under clause (a) above.

9.  CLOSING DELIVERIES.

9.1.  Seller's Closing Deliveries.  At Closing, Seller shall deliver, or cause to be delivered, to Buyer the following with respect to the Property:

9.1.1.  A Special Warranty Deed ("Deed") for the Real Property in recordable form and in the form attached hereto as Exhibit C with the covenant of further assurances, conveying to Buyer title to the Real Property, free from all liens, encumbrances, easements, conditions and other matters affecting title except the Permitted Exceptions.

9.1.2.  A Bill of Sale and General Assignment substantially in the form attached as Exhibit B ("Bill of Sale").

9.1.3.  A Nonforeign Certificate as required by the regulations under the Foreign Investment in Real Property Tax Act (FIRPTA).

9.1.4.  A closing statement agreed to by the parties which reflects all adjustments to the Purchase Price contemplated by this Agreement ("Closing Statement").

9.1.5.  Any transfer documents or certificates required by any applicable government authority to complete this transaction, including, without limitation, an IRS 1099-S

form, District of Columbia Real Property Recordation and Transfer Tax Form FP-7/C ("Form FP-7/C"), and any forms relating to any transfer, recordation or other similar tax.

9.1.6.   An Owner's Affidavit and a survey affidavit of "no change" on the Title Company's standard forms with Seller confirming the absence of mechanic's liens and of parties in possession of the Real Property and a "gap" indemnity, as well as no material, physical changes to the Property since the date of the survey provided by Seller. Seller shall also provide the Title Company with a Certificate of Good Standing from the D.C. Department of Consumer and Regulatory Affairs confirming Seller's legal existence and such other evidence reasonably satisfactory to the Title Company of the authority of the person(s) signing on behalf of Seller to execute the deed of conveyance and other closing documents.

9.1.7.   All books, records, operating reports, files and other materials in the possession or control of Seller which are necessary in Buyer's reasonable discretion to maintain continuity of operation of the Real Property, provided Buyer shall fully cooperate with Seller's requests to obtain copies of same for six (6) months following the Closing at no cost to Buyer, if required for purposes of any proceeding, action or federal, state or local tax investigation or audit.

9.1.8.   The Holdback Escrow Agreement.

9.2.   Buyer's Closing Deliveries.   At Closing, Buyer shall deliver, or cause to be delivered, to Seller the following:

9.2.1.   The Purchase Price (with credit for the Deposit).

9.2.2.   A counterpart original of the Bill of Sale.

9.2.3.   A counterpart original of Form FP-7/C.

9.2.4.   The Closing Statement.

9.2.5.   The Holdback Escrow Agreement.

9.2.6.   A certificate that Seller's representations and warranties set forth in this Agreement remain true, complete and correct as of Closing.

9.2.7.   Any transfer documents or certificates required by any applicable governmental authority to complete this transaction, including, without limitation, any forms relating to any transfer, recordation tax or other similar tax.

9.2.8.   All other documents reasonably required by the Title Company to effectuate this Agreement and the transaction contemplated by this Agreement.

10.   APPORTIONMENTS; EXPENSES.

10.1.   Apportionments.   The following matters shall be apportioned and adjusted between Seller and Buyer as of the Closing Date.

10.1.1. <u>Taxes</u>. Applicable real estate taxes for the Property shall be apportioned as of the Closing Date (i.e., with Seller being responsible for all such amounts payable with respect to the period prior to the Closing Date and with Buyer being responsible for all such amounts payable with respect to the period on and after the Closing Date). The term "real estate taxes" shall include any installments of betterment, special or similar assessments, Business Improvement District taxes, other special tax districts, and taxes attributable to the gross receipts or gross rental income of the Real Property.

10.1.2. <u>Contracts</u>. amounts owed by Seller or paid under the Contracts as of the Closing that Buyer is assuming.

10.1.3. <u>In General</u>. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom in the County in which the Land is located. All prorations shall be made on a 365-day calendar year basis, based on the actual number of days in the applicable month. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 10 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight at the end of the day preceding the Closing Date and Buyer shall bear all such expenses and receive all such income accruing thereafter. Seller will agree to any reasonable escrow for water and sewer charges required by the Title Company,

10.1.4. <u>Calculations; Survival</u>. Except as otherwise set forth herein, all items to be apportioned and adjusted pursuant to this Section 10 shall be prorated as of 11:59 p.m. of the day prior to the Closing Date. All items of income and expense which accrue for the period prior to the Closing Date will be for the account of Seller and all items of income and expense which accrue for the period on and after the Closing Date will be for the account of Buyer; provided, that if Buyer's payment of the Purchase Price is received by the Escrow Agent after 2:00 p.m., Washington, D.C. time on the Closing Date, all items of income and expense which accrue on the Closing Date will be for the account of Seller. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty-five (365) day year. The amount of such apportionments and adjustments shall be initially performed at Closing but shall be subject to adjustment in cash after the Closing as and when complete and accurate information becomes available, if such information is not available at the Closing. The provisions of this Section 10 shall survive the Closing for a period of thirty (30) days.

10.2. <u>Expenses</u>.

10.2.1. <u>Seller's Expenses</u>. Seller shall pay: (a) the transfer tax incident to the transfer of the Real Property, as calculated pursuant to Title 47, Chapter 9 of the Code of the District of Columbia (the "<u>Transfer Tax</u>"), and (b) expenses incurred by Seller in connection with the transaction contemplated by this Agreement.

10.2.2. <u>Buyer's Expenses</u>. Buyer shall pay: (a) the recordation tax, as calculated pursuant to Title 42, Chapter 11 of the code of the District of Columbia and all recordation taxes and costs except for the Transfer Tax, incident to the transfer of the Real Property and recording

of the Deed, (b) the costs of the Title Company and Escrow Agent, and (c) its own expenses incurred in connection with this Agreement, including, without limitation, all premiums for Buyer's title insurance policy or policies; (ii) the cost of any survey work requested by Buyer, and expenses incurred by Buyer in connection with its financing and the transaction contemplated by this Agreement.

10.2.3. Other Expenses. Except as specifically provided in this Agreement, Seller and Buyer shall allocate all closing costs between them in accordance with customary practice in the District of Columbia.

## 11.   EMINENT DOMAIN; CASUALTY.

11.1.   Eminent Domain. If prior to the Closing Date condemnation proceedings are commenced against all or any part of the Real Property, then Seller shall promptly notify Buyer of the same ("Taking Notice") and the following provisions shall apply:

11.1.1. Total Taking. If in the event such condemnation is commenced against all or substantially all of the Real Property, this Agreement shall terminate in which event (a) the Deposit shall be returned to Buyer and (b) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation under this Agreement.

11.1.2. Material Taking. In the event such condemnation is Material (as defined below) but not a total taking as set forth in Section 11.1.1 above, Buyer shall have the right to terminate this Agreement by notice from Buyer to Seller given on or before the date that is the earlier to occur of (a) ten (10) days after the date of the Taking Notice, and (b) the Closing. In the event Buyer does not terminate this Agreement, Buyer shall accept such title to the Real Property as Seller can deliver, in which case Seller shall pay over or assign to Buyer all rights and proceeds arising by reason of such taking (less any collection costs incurred by Seller in connection therewith and any costs and expenses incurred by Seller to restore the Property) and Buyer shall pay the Purchase Price without reduction. If Buyer terminates this Agreement pursuant to this Section 11.1.2, (i) the Deposit shall be returned to Buyer, and (ii) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation under this Agreement.

11.1.3. Immaterial Taking. In the event such condemnation is not Material, then Buyer shall accept such title to the Real Property as Seller can deliver, in which case Seller shall pay over or assign to Buyer all rights and proceeds arising by reason of such taking (less any collection costs incurred by Seller in connection therewith and any costs and expenses incurred by Seller to restore the Property) and Buyer shall pay the Purchase Price at the Closing without reduction.

11.1.4. "Material". For purposes of this Section 11.1, the term "Material" shall mean a condemnation involving (i) any portion of the rentable square feet of the Improvements, or (ii) 10% or more of the Land or (iii) any condemnation which would affect zoning compliance of the Property.

11.2.   Casualty. If any time prior to the Closing any portion of the Improvements is destroyed or damaged as a result of fire or any casualty, Seller shall promptly notify Buyer of the

same. The rights and obligations of the parties by reason of such destruction or damage shall be as follows:

11.2.1. If the Restoration Cost (defined below) of such destruction or damage shall be Two Hundred Fifty Thousand Dollars ($250,000.00) ("Repair Threshold") or less or is not a Material Casualty, the obligations of the parties under this Agreement shall not be affected by such destruction or damage, and Buyer shall accept title to the Property in its destroyed or damaged condition. Buyer shall pay the Purchase Price without reduction, and Seller shall pay over or assign to Buyer without recourse all rights to any proceeds of insurance payable with respect to such destruction or damage (less any collection costs incurred by Seller in connection therewith and any costs and expenses incurred by Seller to restore the Property), and Buyer shall receive a credit against the Purchase Price in the amount of any deductible.

11.2.2. If (i) the Restoration Cost of such destruction or damage shall exceed the Repair Threshold or (ii) such casualty is uninsured (each, a "Material Casualty"), Buyer shall have the right to terminate this Agreement by notice from Buyer to Seller given on or before the date that is the earlier to occur of (a) ten (10) days after the date of the Cost Notice (defined below) or (b) the Closing. In the event Buyer does not terminate this Agreement, Buyer shall accept title to the Property in its destroyed or damaged condition in accordance with and subject to the provisions of Section 11.2.1. In the event Buyer so terminates this Agreement, (i) the Deposit shall be returned to Buyer, and (ii) except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation to the other under this Agreement.

11.2.3. The term "Restoration Cost" shall mean the amount of Seller's good faith estimate of the actual cost of repair and restoration. Seller shall send Buyer notice of the Restoration Cost ("Cost Notice") promptly after making the aforesaid estimate.

12.   DEFAULT AND REMEDIES.

12.1.   Seller's Remedies. If Buyer defaults in its obligation to close under this Agreement when required hereunder, Seller shall be entitled to receive the entire Deposit as agreed liquidated damages (and not as a penalty) and as Seller's sole remedy, in lieu of, and as full compensation for, all other rights or claims of Seller against Buyer by reason of such default. Upon such payment to Seller of the Deposit, this Agreement shall terminate and, except as expressly provided for in this Agreement, neither Seller nor Buyer shall have any further liability or obligation under this Agreement. Buyer and Seller acknowledge that the damages to Seller resulting from Buyer's breach would be difficult, if not impossible, to ascertain with any accuracy, and that the liquidated damage amount set forth in this Section 12.1 represents both parties' reasonable efforts to approximate such potential damages.

12.2.   Buyer's Remedies. If Seller defaults in its obligation to close under this Agreement, Buyer's sole remedy therefor shall be to either (a) bring an action for specific performance of Seller's obligations under this Agreement, provided that any action for specific performance must be initiated no later than thirty (30) days after the date that Closing is otherwise required to occur under this Agreement, provided that if specific performance is not available for any reason, then Buyer shall have the right to proceed pursuant to Section 12.3 clause (a) below; or (b) terminate this Agreement and receive the entire Deposit, in which event the Seller shall reimburse the Buyer

14

for Buyer's out of pocket costs up to Two Hundred Fifty Thousand Dollars ($250,000) (with no cap applying in the event of Seller's fraud or willful failure to close).

12.3. <u>Seller's Liability</u>.   Notwithstanding any provisions in this Agreement to the contrary, (a) Seller's maximum liability under this Agreement and any of the documents delivered by Seller under this Agreement (including, without limitation, all of the documents delivered at Closing and any documents of further assurance required thereafter) for liabilities that survive Closing shall not exceed in the aggregate Five Hundred Thousand Dollars ($500,000.00) ("<u>Liability Cap</u>"), and (b) Buyer hereby waives any claim it may otherwise have against Seller under this Agreement or any such documents for the first Five Thousand Dollars ($5,000.00) of all claims in the aggregate under this Agreement or such documents ("<u>Claims Floor</u>").   The foregoing notwithstanding, in no event shall either the Claims Floor or Liability Cap apply to any items required to be prorated at Closing or after Closing, nor to legal fees, court costs or other expenses to which Buyer may be entitled to be reimbursed by Seller hereunder, or any claims resulting from Seller's fraud, or any claims under Section 15 or for any breaches of Section 4.1.1, Section 4.1.6 or Section 4.1.10. Seller agrees that at Closing the amount of Forty Thousand Dollars ($40,000.00) (the "<u>Holdback</u>") shall be withheld from Seller's proceeds and deposited in an escrow account with Escrow Agent (or another escrow agent acceptable to Buyer and Seller) for three (3) months following the Closing Date (the "<u>Claims Period</u>") pursuant to the Escrow Agreement attached to this Agreement as <u>Exhibit D</u> (the "<u>Holdback Escrow Agreement</u>"), and that upon the expiration of the Claims Period, to the extent that claims made by Buyer under this Agreement have been fully resolved, all remaining amounts shall immediately be released to Seller.   The Holdback is intended to secure payment of any post-Closing obligations of Seller claimed by Buyer during the Claims Period and shall be applied in accordance with the terms of the Holdback Escrow Agreement.

12.4.   <u>Remedies Exclusive</u>.   The remedies set forth in this Section 12 constitute the sole remedies at law or in equity available to Buyer and Seller, as the case may be, on account of the other party's breach of its obligations to close under this Agreement, provided, however, to the extent any terms or provisions of this Agreement are expressly not limited by any liquidated damages or Liability Cap, Buyer and Seller shall have all remedies with respect thereto as may be available at law or in equity.   In no event, however, shall either party to this Agreement be liable for any consequential, special, lost profits, indirect or punitive damages.

13.    <u>FURTHER ASSURANCES</u>.

After the Closing, Seller and Buyer agree to perform such other acts, and to execute, acknowledge and deliver, such other instruments, documents and other materials as the other may reasonably request (at no cost or liability to the performing party) and as shall be necessary in order to effect the consummation of the transactions contemplated by this Agreement or to provide further assurances of any transfer, conveyance or assignment made pursuant to this Agreement. The provision of this Section 13 shall survive the Closing for a period of six (6) months.

14.    <u>NOTICES</u>.

Except as may be otherwise provided in this Agreement, all notices, demands, requests or other communications required or permitted to be given under this Agreement must be delivered

to the following addresses (a) personally, by hand delivery; (b) by a private delivery service designated by the Internal Revenue Service under IRC Section 7502(f), or (c) by email, provided that a confirmation copy is delivered within one (1) business day by the method set forth in clause (a) or (b) of this Section 14. All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a business day or is required to be delivered on or before a specific day which is not a business day, the day of receipt or required delivery shall automatically be extended to the next business day.

|  |  |
|---|---|
| If to Seller: | 1737 H STREET, LLC<br>1420 Beverly Road<br>McLean, VA 22101<br>Attn: Charis C. Lapas<br>Email: clapas@gphomesusa.com |
| with a copy to: | Tramonte, Yeonas, and Roberts, PLLC<br>8245 Boone Blvd., Suite 400<br>Vienna, VA 22182<br>Attn: George P. Yeonas<br>Vincent A. Tramonte, II<br>Email: gyeonas@tyrlawfirm.com<br>vtramonte@tyrlawfirm.com |
| If to Buyer: | Bohio7 LLC<br>1920 L Street, N.W., Suite 200<br>Washington, D.C. 20036<br>Attn: Neil Patel<br>E-mail: neil@dailycaller.com |
| with a copy to: | Grossberg, Yochelson, Fox & Beyda, LLP<br>1200 New Hampshire Ave., N.W., Suite 555<br>Washington, D.C. 20036<br>Attn: Adam W. Walsh, Esq.<br>E-mail: walsh@gyfb.com |

Notice given by counsel to a party to this Agreement shall be considered notice given by such party. Any party to this Agreement or its counsel may designate a different address for itself by notice given in the manner set forth above.

15.   BROKERS.

Buyer and Seller each represent to the other that it has not dealt with any broker or agent in connection with this transaction other than Cushman & Wakefeld of Washington, D.C. representing Seller (collectively, "Seller's Broker") and Savills representing Buyer ("Buyer's Broker"). Seller's Broker and Buyer's Broker are, collectively, the "Brokers." Seller agrees to pay Seller's Broker's commission in connection with this Agreement pursuant to a separate agreement as provided in such separate agreement. Buyer agrees to pay Buyer's Broker's

commission in connection with this Agreement pursuant to a separate agreement as provided in such separate agreement. Each of Buyer and Seller hereby indemnifies and holds harmless the other from all loss, cost and expenses (including reasonable attorneys' fees and expenses) out of a breach of its representation or undertaking set forth in this Section 15. The provisions of this Section 15 shall survive Closing or the termination of this Agreement.

16.   MISCELLANEOUS.

16.1.   Assignability. Buyer may not assign or transfer all or any portion of its rights or obligations under this Agreement to any other individual, entity or person without the prior written consent of Seller. Provided, however, Buyer may, without the consent of Seller but after written notice to Seller at least five (5) days prior to the Closing, (i) direct that the Deed be granted to an entity or entities formed by Buyer and controlled by or under common control with Buyer ("Permitted Assigns") by written notice to Seller or (ii) assign its rights under this Agreement to an entity formed by Buyer or controlling, controlled by or under common control with Buyer. No assignment or transfer by Buyer will release Buyer of its obligations or liabilities under this Agreement.

16.2.   Governing Law; Parties in Interest. This Agreement shall be governed by the laws of the District of Columbia without giving effect to its conflicts of law principles and shall bind and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, successors, and assigns.

16.3.   Recording. Neither a notice nor memorandum of this Agreement nor any lis pendens may be recorded in any public record. A violation of this prohibition shall constitute a material breach of this Agreement and the non-breaching party shall, notwithstanding anything contained herein to the contrary, be entitled to all of its legal and equitable remedies, including injunctive relief.

16.4.   Time of the Essence. Time is of the essence of each and every provision of this Agreement.

16.5.   Headings. The headings preceding the text of the sections and subsections hereof are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

16.6.   Counterparts; Signatures. This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Facsimile signatures and signatures delivered electronically (for example by pdf file) shall be deemed to be the equivalent of original signatures for purposes of this Agreement and any amendments hereto.

16.7.   Exhibits. All Exhibits which are referred to in this Agreement and which are attached to this Agreement are expressly made and constitute a part of this Agreement.

16.8.   Merger.   Except as otherwise specifically provided in this Agreement, the acceptance of the Deed by the recordation thereof shall be deemed to be a full and complete

performance and discharge of every agreement and obligation of Seller contained in this Agreement.

16.9.   Entire Agreement; Amendments.   This Agreement and the Exhibits to this Agreement set forth all of the covenants, representations, warranties, agreements, conditions and undertakings between the parties to this Agreement with respect to the subject matter of this Agreement, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.  This Agreement may not be changed orally but only by an agreement in writing, duly executed by or on behalf of the party or parties against whom enforcement of any waiver, change, modification, consent or discharge is sought.

16.10.   JURY TRIAL WAIVER.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE RELATIONSHIP OF BUYER AND SELLER UNDER THIS AGREEMENT.  THIS JURY TRIAL WAIVER PROVISION SHALL SURVIVE THE CLOSING OR THE TERMINATION OF THIS AGREEMENT.

16.11.   Exclusive Jurisdiction.  All parties to this Agreement agree to (i) submit to the exclusive jurisdiction of the federal and local courts in the District of Columbia (the "Specified Courts") for any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement; (ii) commence any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement only in the Specified Courts; (iii) waive any objection to the laying of venue of any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement in the Specified Courts; and (iv) waive and not to plead or claim that any such action or proceeding brought in any of the Specified Courts has been brought in an inconvenient forum.  This provision shall survive the Closing or the termination of this Agreement.

16.12.   No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties to this Agreement (and their respective successors and assigns), and no other person or entity shall be deemed to be a third-party beneficiary of this Agreement.

16.13.   Business Day.  For purposes of this Agreement, "business day" means any day on which business is generally transacted by banks in Washington, D.C.  If a date or the expiration date of any period in this Agreement falls upon a day that is not a business day, then the date or expiration date of such period shall be extended to the next business day.

16.14.   Severability.  If any one or more of the provisions hereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

16.15.   Soil Characteristics Disclosure.  In accordance with the laws of the District of Columbia, Buyer is advised by Seller that the characteristic of the soil of the Real Property as described by the Soil Conservation Service of the United States Department of Agriculture in the

Soil Survey of the District of Columbia published in 1976, as the same may be amended from time to time, and as shown on the Soil Maps of the District of Columbia at the back of that publication, is Urban Land. For further information, Buyer can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the United States Department of Agriculture.

16.16. Legal Fees. If either Seller or Buyer brings any legal action or similar action with respect to this Agreement, the subject matter thereof or the transactions contemplated hereby, the prevailing party shall be entitled to reimbursement of its reasonable legal fees and other costs associated with such action. This provision shall survive the Closing or any termination hereunder.

16.17. Waiver. Failure or delay by either party to insist on the strict performance of any covenant, term, provision or condition hereunder, or to exercise any option herein contained, or to pursue any claim or right arising under this Contract, shall not constitute or be construed as a waiver of such covenant, term, provision, condition, option, claim or right (except that if a party proceeds to Closing, notwithstanding the failure of a condition to its obligation to close, then such condition shall be deemed waived by virtue of the Closing). Any waiver by either party shall be effective only if in a writing delivered to the other party hereto and setting forth, with specificity, the covenant, term, provision or condition so waived. Any such waiver shall not constitute or be construed as a continuing waiver of any subsequent default.

16.18. Exclusivity. Seller agrees not to market the Property for sale, or negotiate or accept any other offers for the purchase thereof. Notwithstanding the foregoing, should this Agreement terminate without Closing, the exclusivity provision in this Section 16.18 shall also terminate.

16.19. Indemnification. Seller and Buyer shall indemnify, defend and hold the other (the "indemnified party") harmless from any liability, claim, demand, loss, expense or damage that is suffered by or asserted by any third party against the indemnified party arising from any act or omission of the indemnitor, its agents, employees or contractors or otherwise arising out of the ownership or operation of the Property first arising or occurring prior to the Closing (with respect to Seller as indemnitor) or from and after the Closing (with respect to Buyer as the indemnitor). The obligations of the parties under this Section 16.19 shall survive the Closing Date.

IN WITNESS WHEREOF, the parties have executed and delivered this Purchase and Sale Agreement as of the date first above written.

[Signatures Appear on Following Page]

[Signatures to Purchase and Sale Agreement]

SELLER:

1737 H STREET, LLC,
a Delaware limited liability company

By: _____

Name: CHARLES C. LAPAS

Its: VICE PRESIDENT

BUYER:

BOHIO7 LLC,
a Delaware limited liability company

By: _____

Name: Neil Patel

Its: Manager

EXHIBIT A    LEGAL DESCRIPTION OF THE LAND
EXHIBIT B    FORM OF BILL OF SALE AND GENERAL ASSIGNMENT
EXHIBIT C    FORM OF SPECIAL WARRANTY DEED
EXHIBIT D    FORM OF HOLDBACK ESCROW AGREEMENT
EXHIBIT E    LIST OF SERVICE AGREEMENTS

SCHEDULE 1.2      Furniture and Furnishing

[Signatures to Purchase and Sale Agreement]

SELLER:

1737 H STREET, LLC,
a Delaware limited liability company

By: _____
     Name: _____
     Its: _____

BUYER:

BOHIO7 LLC,
a Delaware limited liability company

By: _____
     Name:  Neil Patel
     Its:  Manager

EXHIBIT A   LEGAL DESCRIPTION OF THE LAND
EXHIBIT B   FORM OF BILL OF SALE AND GENERAL ASSIGNMENT
EXHIBIT C   FORM OF SPECIAL WARRANTY DEED
EXHIBIT D   FORM OF HOLDBACK ESCROW AGREEMENT
EXHIBIT E   LIST OF SERVICE AGREEMENTS

SCHEDULE 1.2    Furniture and Furnishing

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Lot numbered 40 in Square numbered 127 in a subdivision made by Floecker and McFee of parts of Lots 12, 13, and 14 and alley, as per plat recorded in Liber No. 30 at folio 101, among the Records of the Office of the Surveyor of the District of Columbia.

(End of Exhibit A)

EXHIBIT B

FORM OF BILL OF SALE AND GENERAL ASSIGNMENT

## BILL OF SALE AND GENERAL ASSIGNMENT

This BILL OF SALE AND GENERAL ASSIGNMENT is made as of the ____ day of _____, 2019 by and between 1737 H STREET, LLC a Delaware limited liability company ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, by Deed of even date herewith, Assignor conveyed to Assignee the property ("Real Property") described on Exhibit A attached hereto and made a part hereof, together with all improvements located thereon (collectively, the "Improvements" and together with the Real Property, the "Property"); and

WHEREAS, it is the desire of Assignor hereby to assign, transfer and convey to Assignee certain personal property and other rights of Assignor associated with the Property, as hereinafter set forth.

THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor:

1.     <u>Assignment</u>. Assignor hereby sells, assigns and transfers to Assignee, its successors and assigns, and Assignee hereby assumes and accepts, all of Assignor's right, title, and interest, if any, in and to the following:

(a)     All licenses, permits issued or granted by governmental bodies, officers and authorities exclusively in respect of the ownership, occupancy, use and operation of the Real Property, to the extent such Permits exist, are in Seller's possession and are assignable or transferable without penalty or payment by Seller (unless Assignee agrees to assume responsibility for such penalty or payment in a manner reasonably acceptable to Assignor), and

(b)     All fixtures and other tangible personal property used by Assignor solely in connection with the operation of the Improvements and located in the Improvements including, without limitation, boilers, pumps, tanks, electric panel switchboards, lighting equipment and wiring, heating, plumbing, ventilating and air conditioning apparatus and equipment, together with all assignable intangible property used solely in connection with the operation or maintenance of the Real Property (collectively, "Personal Property")

TO HAVE AND TO HOLD the Assigned Property unto Assignee and Assignee's successors and assigns, forever.

2.     <u>Condition</u>. The Personal Property is conveyed and accepted in its present condition, "AS-IS, WHERE-IS," and Assignor does not make any representation or warranty, express or implied, with respect to the merchantability, condition, quality, durability, design, operation, fitness for use or suitability for any particular purpose of the Personal Property, but assigning any and all manufacturer's and vendor's warranties for the Personal Property, if any, to the extent remaining in existence and assignable.

B - 1

3.  <u>Successors and Assigns</u>.  This Assignment shall inure to the benefit of, and be binding upon, the successors, and assigns of the parties hereto.

4.  <u>Governing Law</u>.  This Assignment shall be construed under and enforced in accordance with the laws of the District of Columbia without regard to its conflicts of law principles.

5.  <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts which shall together constitute a single document.  Facsimile or pdf signatures shall be deemed to be the equivalent of original signatures for purposes of this Agreement.

<u>ASSIGNOR</u>:

1737 H STREET, LLC
a Delaware limited liability company

DO NOT SIGN – EXHIBIT ONLY

By: _____
        Name: _____
        Its: _____


<u>ASSIGNEE</u>:

_____,
a _____

DO NOT SIGN – EXHIBIT ONLY

By: _____
        Name: _____
        Its: _____

B - 2

EXHIBIT C

FORM OF SPECIAL WARRANTY DEED

**SPECIAL WARRANTY DEED**

THIS SPECIAL WARRANTY DEED (this "**Deed**") is made this _____ day of September, 2019, by and between_____, whose address is _____("**Grantor**"), and_____, whose address is _____("Grantee").

WITNESS:

For and in consideration of the sum of Eight Million and 00/100 Dollars ($8,000,000.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT, BARGAIN, SELL, TRANSFER and CONVEY, with Special Warranty, unto Grantee, its successor and assigns, in fee simple, the parcel of land located in the District of Columbia, described on Exhibit A attached hereto and incorporated herein.

TOGETHER with all right, title and interest of Grantor in and to any land lying in the bed of any existing, dedicated street, road or alley; and

TOGETHER with all with all strips and gores adjoining thereto and all appurtenances, rights, easements, licenses, rights-of-way, covenants, tenements, hereditaments and other rights incident thereto, including, without limitation, any right or option to acquire or benefit from any future easement or right-of-way to the extent that such rights and interests may benefit such real property; and

TOGETHER with all structures, improvements and fixtures (if any) located in or on such parcel of land.

TO HAVE AND TO HOLD all of the aforesaid property (the "**Property**") unto the use and benefit of Grantee, its successors and assigns, in fee simple forever.

This conveyance is made subject to all matters of record.

Grantor covenants that it has the right to convey the Property to Grantee and that Grantor will execute such further assurances of the Property as may be requisite.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed as of this ___ day of September, 2019.

**GRANTOR:**

STATE OF _____      )
                               ) ss.
COUNTY OF _____         )


On _____ _____, 2019 before me, a Notary Public in and for said State, personally appeared _____ of _____(who proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature: _____

(Notary Seal)

My Commission Expires: _____

C - 3

**EXHIBIT A**

<u>Legal Description</u>

EXHIBIT D

FORM OF HOLDBACK ESCROW AGREEMENT

## HOLDBACK ESCROW AGREEMENT

**THIS HOLDBACK ESCROW AGREEMENT** (this "**Agreement**"), dated as of the ___ day of _____, 2019, is made by and between (A)_____, having an address of _____22304 (the "**Seller**") and (B) _____, a _____, having an address of_____ (the "**Buyer**") and **FIRST AMERICAN TITLE INSURANCE COMPANY** ("**Escrow Agent**") having an address of_____, Attn: ___("**Escrow Agent**").

## RECITALS

A.      Pursuant to the terms of a Purchase and Sale Agreement dated August __, 2019 (as amended and/or assigned, collectively, the "**Purchase Agreement**"), Seller agreed to sell to_____, as predecessor-in-interest to Buyer, and Buyer agreed to buy, all of Seller's right, title and interest in and to the Property as described in the Purchase Agreement. Simultaneous with the execution of this Agreement, Seller and Buyer are closing on the sale of the Property pursuant to the terms of the Purchase Agreement.

B.      Seller has agreed to place into escrow with Escrow Agent, at the time of Closing, the sum of Forty Thousand and 00/100 Dollars ($40,000.00) (the "**Deposit**") in order to secure for the benefit of Buyer the payment by Seller of any and all amounts that may become due and payable in connection with the liability of Seller for breaches of its representations, warranties, covenants and/or indemnities as set forth in the Purchase Agreement to the extent they are intended to survive Closing.

C.      In accordance with the terms of the Purchase Agreement, Seller has on this date delivered the Deposit into escrow with the Escrow Agent.

D.      Escrow Agent is willing to perform the escrow duties with respect to the Deposit as more particularly set forth in this Agreement.

E.      Capitalized terms not otherwise defined in this Agreement shall retain their meaning as set forth in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer, Seller and Escrow Agent hereby agree as follows:

1.      Seller and Buyer appoint Escrow Agent, and Escrow Agent agrees to serve, as the escrow agent in connection with the Deposit under the terms of this Agreement. Escrow Agent undertakes to perform only those duties that are expressly set forth in this Agreement, and Buyer and Seller acknowledge that these duties are purely ministerial in nature.

2.      Escrow Agent hereby acknowledges receipt of the Deposit and shall maintain the Deposit in a separate interest-bearing account, paying a money market rate of interest, in a banking

institution located in the Washington D.C. metropolitan area. Accrued interest on the Deposit shall be deemed a part thereof and shall be disbursed along with the Deposit as herein provided. Escrow Agent shall apply and disburse the Deposit in accordance with the terms of this Agreement.

3.      Buyer shall have until the date that is three (3) months following the date of Closing (the "**Claims Period**") in which to give written notice to Escrow Agent and Seller alleging a breach of any surviving representation, warranty, covenant, or indemnity of Seller under the Purchase Agreement, such that Buyer alleges that it is entitled to receive all or a portion of the Deposit as a reimbursement for or satisfaction of any loss, cost, liability or expense actually incurred by Buyer as a result of such breach. If Buyer fails to give such a notice within the Claims Period, Escrow Agent shall release the entire Deposit to Seller and this Agreement shall terminate. If Buyer gives such a notice or notices within the Claims Period, Escrow Agent shall distribute the Deposit to Seller and/or Buyer, as the case may be, in accordance with the terms of this Agreement.

4.      If Buyer claims entitlement to all or any portion of the Deposit, it shall give written notice thereof to Escrow Agent and shall simultaneously therewith deliver a copy of such written notice to Seller (the "**Buyer's Notice**"). Seller shall have ten (10) business days following its receipt of the Buyer's Notice to deliver written notice to Escrow Agent objecting to the release of the Deposit to Buyer ("**Seller's Objection Notice**"), a copy of which Seller's Objection Notice shall be simultaneously delivered to Buyer. If Escrow Agent does not receive a timely Seller's Objection Notice, Escrow Agent shall give written notice to Seller that Escrow Agent (i) has received a Buyer's Notice (attaching a copy of the Buyer's Notice), (ii) has not received a Seller's Objection Notice and (iii) is prepared to release a portion of the Deposit to Buyer ("**Escrow Agent's Notice**"). If Seller has not delivered a Seller's Objection Notice within ten (10) business days after receipt of Escrow Agent's Notice then Escrow Agent shall immediately deliver to Buyer, without the need for further notice to or consent from Seller, the portion of the Deposit then being claimed by Buyer. If Escrow Agent does receive a timely Seller's Objection Notice, Escrow Agent shall release the Deposit only upon receipt of, and in accordance with, written instructions signed by both Seller and Buyer or the final order of a court of competent jurisdiction.

5.      Escrow Agent shall be obligated to release the Deposit or any remaining balance thereof (provided there are no then-outstanding or unsatisfied claims to all or a portion of the Deposit by Buyer) upon the expiration of the Claims Period to such person or entity as instructed by Seller to the Escrow Agent in writing (with a copy to Buyer).

6.      Escrow Agent may rely and shall be protected in acting or refraining from acting upon any written notice, statement, instruction or request furnished to it under this Agreement and believed by it to be genuine and to have been signed or presented by the proper party or parties. Escrow Agent shall be under no duty to make any inquiry as to the form, genuineness, proper execution, or accuracy of the notice, statement, instruction, or request.

7.      Escrow Agent shall have no liability whatsoever under this Agreement except in the case of its gross negligence or intentional misconduct. Escrow Agent may consult with counsel of its own choice and shall have full and complete authorization and protection for any action taken or suffered by it in good faith and in accordance with the opinion of its counsel.

8.     If conflicting demands are made or conflicting notices are served upon the Escrow Agent with respect to the Deposit, Escrow Agent shall refuse to comply with the claims or demands and cease all further proceedings in the performance of this Agreement so long as the disagreement shall continue.  In so doing, the Escrow Agent shall not be liable for damages or injuries to any person for its failure to comply with the conflicting or adverse demands or notices.  Escrow Agent shall continue to refrain or refuse to act until (i) the rights of the adverse claimants have been finally adjudicated in a court assuming jurisdiction of the parties and the Deposit, or (ii) all differences have been adjusted by mutual agreement of the parties and the Escrow Agent shall have been notified of the agreement by a writing signed by all parties to the dispute.  In the alternative, Escrow Agent may, but shall not be obligated to, file a suit in interpleader for a declaratory judgment for the purposes of having the respective rights of the claimants adjudicated and may deliver to the court the Deposit.

9.     If the Deposit is at any time attached, garnished, or levied upon under any court order or if the payment or delivery of the Deposit is stayed or enjoined by any court order, or if any order, judgment or decree shall be made or entered by any court affecting the Deposit, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with the order, writ, judgment or decree.  Escrow Agent shall not be liable to any of the parties or to any other person, firm or corporation by reason of such compliance even though the order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

10.    Upon making disposition of the Deposit in accordance with the express terms of this Agreement, Escrow Agent shall be deemed fully released and discharged from any and all duties and obligations under this Agreement without the need that any other documentation be executed.

11.    The Deposit will be placed with and held in escrow by Escrow Agent in immediately available funds in an interest-bearing account at a mutually acceptable banking institution.  Escrow Agent shall not be responsible for (i) any fluctuations in the interest rate applicable to any cash held by it pursuant to or by virtue of this Agreement; (ii) the validity, sufficiency, collectability, or legal effect of any instrument deposited with Escrow Agent; (iii) the renewal, extension, or replacement of any letters of credit deposited with Escrow Agent; (iv) the loss or impairment of the Deposit resulting from the failure, insolvency, suspension, conservatorship, or receivership of a financial institution or other depository, or (v) the availability or sufficiency of federal deposit insurance with respect to the Deposit.

12.    Seller and Buyer shall indemnify and hold harmless Escrow Agent against all loss, liability, claim, and expense, including attorneys' fees and litigation costs, incurred by Escrow Agent arising out of or in any way related to Escrow Agent's duties under this Agreement.

13.    All notices or other communications hereunder shall be in writing and shall be deemed duly given if addressed and delivered to the respective parties' addresses, as set forth below: (i) in person; (ii) by FedEx or similar overnight carrier service; (iii) mailed by certified or registered mail, return receipt requested, postage prepaid; or (iv) sent by electronic mail.  Such notices shall be deemed received upon the earlier of receipt or, if mailed by certified or registered mail, three (3) business days after such mailing.  Seller, Buyer and Escrow Agent may from time to time by written notice to the other designate another address for receipt of future notices.

**If to Seller:**

**If to Buyer:**

Attn:

with a copy to:

Grossberg, Yochelson, Fox & Beyda, LLP
1200 New Hampshire Avenue, N.W.
Suite 555
Washington, D.C.  20036-6814
Email:  walsh@gyfb.com
Attn:  Adam W. Walsh, Esq.

**If to the Escrow Agent:**

14.   Miscellaneous.

14.1.   Entire Agreement.  This Agreement, together with the Exhibits attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

14.2.   Severability.  If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

14.3.   Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the District of Columbia.

14.4.   Counterparts.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[Signature Pages Follow]

**IN WITNESS WHEREOF,** Buyer, Seller and Escrow Agent have executed this Agreement have executed this Agreement as of the date and year first above written.

**BUYER:**

_____

a _____

By: _____

    Name: _____

    Title: _____

**IN WITNESS WHEREOF**, Buyer, Seller and Escrow Agent have executed this Agreement have executed this Agreement as of the date and year first above written.

**SELLER:**

By: _____

Name: CHARIS C. LAPAS

Title: VICE PRESIDENT .

**IN WITNESS WHEREOF**, Buyer, Seller and Escrow Agent have executed this Agreement have executed this Agreement as of the date and year first above written.

**ESCROW AGENT**

By: _____

Name: _____

Title: _____

D - 6